## DISTRICT OF COLUMBIA
## SUPERIOR COURT

SHARYL THOMPSON ATTKISSON,

JAMES HOWARD ATTKISSON,

and

SARAH JUDITH STARR ATTKISSON

      Plaintiffs,

v.                                  Case No.: CA_____

ERIC HOLDER, individually,

PATRICK R. DONAHOE, individually,

UNKNOWN NAMED AGENTS OF the DEPARTMENT OF JUSTICE, in their individual capacities,

UNKNOWN NAMED AGENTS OF the UNITED STATES POSTAL SERVICE, in their individual capacities,

UNKNOWN NAMED AGENTS OF the UNITED STATES, in their individual capacities,

      Defendants.

## COMPLAINT

    The Plaintiffs, by and through their undersigned attorneys, allege the following upon information and belief after due investigation.

    1.    This lawsuit is brought pursuant to *Bivens* and challenges the government's unauthorized and illegal surveillance of the Plaintiffs' laptop computers and telephones from

2011 - 2013 under the First Amendment to the United States Constitution and the Fourth

Amendment to the United States Constitution. *See Bivens v. Six Unknown Named Agents of*

*Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

**JURISDICTION**

2.     The present case arises under the Constitution and laws of the United States and is

within this Court's jurisdiction pursuant to §11-921 and §§13-422 and -423.

**PARTIES**

3.     Plaintiffs incorporate and re-allege each and every allegation above as if fully set

forth herein.

4.     At all times relevant to this lawsuit, Plaintiff Sharyl Atkisson was a citizen and

resident of Leesburg, Virginia, and an investigative reporter for CBS News. She was responsible

for investigating, writing, publishing, and airing investigative news stories on a wide-variety of

topics, including the federal gun-trafficking investigation that came to be known as "*Fast and*

*Furious*," and the controversial attack of the American diplomatic mission in Benghazi, Libya.

At all times relevant hereto, Ms. Atkisson was a member of "the press" as described by the First

Amendment to the Constitution of the United States. In the course of her investigative

journalism, she experienced confrontational encounters with officials within the Department of

Justice and White House who demanded disclosure of the identity of confidential sources who

may have been leaking information. Federal agencies and the White House repeatedly withheld

documents, at times invoking "national security" as the justification. During the same time

period, the Department of Justice implemented efforts to vastly expand its cyber security

capabilities, efforts, and resources in the name of national security and actively targeted

journalists and news organizations as part of leak investigations. Ms. Attkisson discovered that

her computers and telephone had been "hacked," that an unauthorized party or parties had

illegally installed software on her laptop computer, and that her confidential, professional, and

personal information had been illegally accessed.

5.      At all times relevant to this lawsuit, Plaintiff James Howard Attkisson was a

citizen and resident of Leesburg, Virginia, and was married to Sharyl Attkisson. Because much

of the surveillance alleged in this complaint occurred at Ms. Attkisson's residence, Mr. Attkisson

was subjected to surveillance as well, and his confidential, professional, and personal

information were illegally accessed.

6.      At all times relevant to this lawsuit, Plaintiff Sarah Judith Starr Attkisson was a

citizen and resident of Leesburg, Virginia, and the daughter of James and Sharyl Attkisson.

Because much of the surveillance alleged in this complaint occurred at Sarah Attkisson's

residence, she was subjected to surveillance as well, and her confidential, professional, and

personal information were illegally accessed

7.      Defendant Eric H. Holder is the Attorney General of the United States. Attorney

General Holder has ultimately authority over the Department of Justice ("DOJ") and the Federal

Bureau of Investigation ("FBI"). He is sued in his individual and official capacity.

8.      Defendant Patrick R. Donahoe is the Postmaster General and Chief Executive

Officer of the United States Postal Service ("USPS") and has ultimate authority over the USPS.

He is sued in his individual and official capacity.

9.      Plaintiffs are unaware of the true names and capacities, whether individual or

otherwise, of the Unknown Federal Agents and therefore sues those Defendants by fictitious

names. Plaintiffs are informed and believe, and on that basis allege, that these Defendants, and

each of them, are in some manner responsible and liable for the acts and/or damages alleged in

this Complaint, and that these Defendants are employees or agents of the federal government

who acted under color of law.

## BACKGROUND

10.    Ms. Attkisson was a reporter for CBS News for twenty (20) years. Her job

required her to investigate and report on national news stories. In 2011, during the course of her

reporting, she began investigating what later became known as the *"Fast and Furious"* gun-

walking story involving federal agents from the Bureau of Alcohol, Tobacco, and Firearms

(ATF) improperly permitting weapons to pass into the hands of the Mexican drug cartels.

11.    Her first "Fast and Furious" report aired on CBS on February 22, 2011. The

report quoted and relied upon numerous confidential sources, all of whom were critical of the

*Fast and Furious* gun-walking strategy deployed by the respective federal agencies.

12.    In February 2011 the ATF, in an internal memorandum, instigated an orchestrated

campaign against Ms. Attkisson's report, including efforts to discredit it, and outlined a strategy

for the Agency to push "positive stories" in order to "preempt some negative reporting."[1]

13.    Despite the foregoing efforts, Ms. Attkisson continued to report *Fast and Furious*

stories. When contacted for comment, DOJ officials persisted in their denial of the allegations

---

[1] See http://www.cbsnews.com/8301-31727_162-20039251-10391695.html

"Given the negative coverage by CBS Evening News last week and upcoming events this week, the bureau should
look for every opportunity to push coverage of good stories. Fortunately, the CBS story has not sparked any follow
up coverage by mainstream media and seems to have fizzled....It was shoddy reporting...ATF needs to proactively
push positive stories this week, in an effort to preempt some negative reporting, or at minimum, lessen the coverage
of such stories in the news cycle by replacing them with good stories about ATF."

and continued efforts to unveil Ms. Attkisson's confidential sources. ATF sources told Ms. Attkisson that the Agency was actively seeking to identify government insiders who were providing information or "leaking" to her and CBS.

14.    In September, 2011, Ms. Attkisson reported on secret audio recordings that implicated the F.B.I. in an alleged discrepancy in its accounting of evidence in the *Fast and Furious* related murder of Border Patrol Agent Brian Terry.

15.    Also in September, 2011, Ms. Attkisson reported on the existence of secret audio recordings implicating the F.B.I. in an alleged discrepancy in accounting of evidence in the *Fast and the Furious* related murder of Border Patrol Agent Brian Terry.

16.    Also in September, 2011, Ms. Attkisson reported on the alleged involvement of an F.B.I. informant in the *Fast and Furious* matter.

17.    In October, 2011, Ms. Attkisson reported on the continuing controversy regarding the F.B.I.'s accounting of evidence in *Fast and Furious*.

18.    In November, 2011, Ms. Attkisson reported on evidence contradicting Attorney General Holder's sworn testimony wherein he claimed that he had only heard of *Fast and Furious* for the first time in the past couple of weeks.

19.    In mid-to-late 2011, Ms. Attkisson, Mr. Attkisson, and Sarah Attkisson began to notice anomalies in numerous electronic devices at their home in Virginia. These anomalies included a work Toshiba laptop computer and a family Apple desktop computer turning on and off at night without input from anyone in the household, the house alarm chirping daily at different times, often indicating "phone line trouble," and television problems, including interference. All of the referenced devices use the Verizon FiOS line installed in Ms. Attkisson's

home. Verizon was unable to cure the problems, despite multiple attempts over a period of more than a year.

20.     In December, 2011, Ms. Attkisson reported on the DOJ's formal retraction of a letter and a misrepresentation made to Congress in February, 2011, which had stated, incorrectly, there had been no "gun-walking."

21.     In January, 2012, Ms. Attkisson contacted Verizon about ongoing internet problems and intermittent connectivity because the residential internet service began constantly dropping off. She had not experienced similar problems previously. In response to the complaint, Verizon sent a new router, which was immediately installed. The new router failed to resolve the issues.

22.     In January, 2012, Ms. Attkisson began a series of reports, spanning several months, that were critical of some of the Executive Branch's green energy initiatives, including the Solyndra failure.

23.     In February, 2012, an unauthorized party or parties remotely installed sophisticated surveillance spyware on Ms. Attkisson's Toshiba laptop. The invasion was obviously unknown to Ms. Attkisson at the time, but revealed later by forensic computer analysis.

24.     In February, 2012, Ms. Attkisson contacted Verizon yet again to complain about continuing anomalies.

25.     In March, 2012, a Verizon representative visited Ms. Attkisson's home and replaced the router a second time. The representative also replaced the entire outside FiOS service box. Despite Verizon's efforts, however, the anomalies persisted.

26.     In April-May, 2012, the DOJ and FBI publicly announced a new effort to vastly

expand cyber related efforts to address alleged "national security-related cyber issues." During

the same time frame, the DOJ secretly--and without notice--seized personal and phone records

belonging to journalists from the Associated Press news agency in violation longstanding DOJ

practice. The records seizure was not publicly known at the time, but was later revealed.[2]

27.     In July, 2012, the DOJ designated U.S. Attorneys' offices to act as "force

multipliers" in its stepped-up cyber efforts in the name of national security.[3]

28.     That same month, July, 2012, intruders remotely "refreshed" the ongoing

surveillance of Ms. Attkisson's Toshiba computer. Again, the access was unknown to Ms.

Attkisson at the time, but was revealed later through computer forensic analysis.

29.     In September, 2012, Wikileaks published internal emails from a global

intelligence company doing business with government agencies. The materials made reference to

"Obama leak investigations" and the alleged "witch hunts of investigative journalists learning

information from inside the beltway sources." The email states, "(T)here is a specific tasker from

the [White House] to go after anyone printing materials negative to the Obama agenda (oh my.)

Even the FBI is shocked."[4]

30.     On October 5, 2012, CBS aired Ms. Attkisson's first Benghazi story for CBS,

which was critical of the Executive Branch's handling of the security requests at the U.S.

---

[2] http://www.washingtonpost.com/world/national-security/under-sweeping-subpoenas-justice-department-obtained-
ap-phone-records-in-leak-investigation/2013/05/13/11d1bb82-bc11-11e2-89c9-3be8095fe767_story.html

[3] http://blogs.justice.gov/main/archives/date/2012/11

[4] http://www.wikileaks.org/gifiles/docs/1210665_obama-leak-investigations-internal-use-only-pls-do-not.html (last
accessed on October 28, 2014).

compound in Benghazi, Libya, where Ambassador Christopher Stevens and three (3) other U.S. personnel were killed on September 11, 2012.

31.     On October 8, 2012, CBS aired another Attkisson report on Benghazi that included an interview with whistleblower Col. Andrew Wood.[5] During the weeks following the airing of Col. Wood's interview, Ms. Attkisson made personal contact with numerous confidential sources within the federal government (or who had links to intelligence agencies within the U.S. government). The confidential government sources reported to Ms. Attkisson that efforts were being made by the Executive Branch to clamp down on leaks and to track the leaking of information to specific reporters regarding the Benghazi affair.

32.     During the same time period, October of 2012, the DOJ continued its stepped-up cyber efforts with its National Security Division providing specialized training at DOJ headquarters for the National Security Cyber Specialists (NSCS) network and the Criminal Division's Computer Crime and Intellectual Property Section (CCIPS).

33.     In the later part of October 2012, Ms. Attkisson, Mr. Attkisson, and Sarah Attkisson began noticing an escalation of electronic problems at their personal residence, including interference in home and mobile phone lines, computer interference, and television interference. They were still unaware of any intrusion, however.

34.     During the same general time frame, several sources with close ties to the intelligence community approached Ms. Attkisson privately and informed her that the government would likely be monitoring her electronically in an effort to identify her confidential sources, and also to monitor her continued *Fast and Furious* and *Benghazi* stories.

---

[5] http://www.cbsnews.com/8301-18563_162-57528335/security-dwindled-before-deadly-libyan-consulate-attack/

35.     From November 7-9, 2012, Attorney General Holder hosted a national training

conference at DOJ headquarters for the expanded efforts of DOJ's National Security Cyber

Specialists (NSCS).[6] On November 13, 2012, the F.B.I. initiated a body of cyber security case

investigations that would later relate to the illegal intrusions directed at Ms. Attkisson.

36.     In November 2012, Ms. Attkisson's phone line became nearly unusable because

of anomalies and interruptions. Her mobile phones also experienced regular interruptions and

interference, making telephone communications unreliable, and, at times, virtually impossible.

37.     In December 2012, Ms. Attkisson discussed her phone and computer issues with

friends, contacts, and sources, via her home phone, mobile phones, and email.  She decided to

begin logging the times and dates that the computers turned on at night without her input.  Soon

after these phone and email discussions, the computer nighttime activity stopped.

38.     Computer forensic analysis later revealed that the intruders initiated remote

actions in December, 2012, to remove evidence of the intrusion from Ms. Attkisson's computers

and home electronic equipment.

39.     In December, 2012, a contact with U.S. government intelligence experience

conducted an inspection of Ms. Attkisson's exterior home. During the course of the inspection,

---

[6] "With the network built, the [Justice] department will be able to accelerate some of the national security cyber work that has been ongoing since [National Security Division's] cyber review." "To equip this large cyber cadre in how to best address these new threats, the department has developed and carried out extensive training.  Last week's inaugural NSCS conference covered topics ranging from digital evidence, to the Foreign Intelligence Surveillance Act, to current threat trends, to common challenges in combating national security cyber threats specifically.  Underscoring the importance of this mission, Attorney General Eric Holder, FBI Director Robert Mueller, Assistant Attorney General Monaco, and others from the department and the FBI addressed the network throughout the three-day conference. .. the network will help strengthen partnerships between the department and agencies across the U.S. government, including the Department of Homeland Security, the Department of Defense, and various elements of the Intelligence Community.  The network also will work particularly closely with the FBI's National Cyber Investigative Joint Task Force (NCIJTF) to help preserve all intelligence collection, prevention, disruption and response options for cyber national security threats. ..Going forward, the NSCS network is focused on ensuring a whole-of-government and all-tools approach to combating cyber threats to national security.  The network will be working to bring investigations and prosecutions as viable options for deterrence and disruption as part of the government-wide response to these threats.  The network will also be advising and consulting other parts of the government in the use of additional tools to counter these threats."
http://blogs.justice.gov/main/?s=NSCS%2C+specialized+training&search.x=25&search.y=16

the consultant discovered an anomaly with Ms. Attkisson's FiOS (Verizon) box: an extra fiber

optics line was dangling from the exterior of the box. Based on the strange finding, Ms.Attkisson

contacted Verizon on December 31, 2012, which denied it had installed or had knowledge of the

extraneous fiber optics line affixed to the equipment at the Attkisson's home and suggested

Attkisson contact law enforcement authorities. Shortly thereafter, a person identifying herself as

a Verizon supervisor telephoned Ms. Attkisson to advise her she was dispatching a technician to

the house. It would be New Year's Day, so Ms. Attkisson informed the purported supervisor that

it was not necessary to dispatch a technician just then, and she offered to send them a photograph

of the stray fiber optics line to save Verizon the trip. The purported supervisor declined the

photograph and insisted that a technician would be present on New Year's Day.

　　　40.　　On January 1, 2013, a Verizon technician visited the Attkisson's home and

removed the additional fiber optics cable from the system. Ms. Attkisson asked the technician to

leave the cable. The technician placed it next to the equipment and left the home. When Ms.

Attkisson's husband arrived home and went to retrieve the extraneous cable, it was no longer

located where the technician left it.

　　　41.　　Throughout the month of January, 2012, Ms. Attkisson repeatedly contacted the

purported Verizon technician to seek the location of the missing cable. The person representing

himself as a technician never returned any of the calls at the number he had provided.

　　　42.　　In January and February of 2013, Ms. Attkisson continued to experience phone

and internet usage issues, including drop-offs, noises, and other interference. Verizon was

notified and technicians and supervisors made additional contacts and visits.

　　　43.　　On January 8, 2013, Ms. Attkisson made arrangements to deliver her Toshiba

laptop to a contact with connections to a government forensics computer expert in the

intelligence community. On January 9, 2013, the forensics expert reported to Ms. Attkisson that the Toshiba laptop showed clear evidence of outside and unauthorized "intrusion," and that the sources of the intrusion were state-supported due to the nature of the technology used.

44.     On January 10, 2013, the computer was returned to Ms. Attkisson through an intermediary, along with a report. According to the report, the forensics computer expert found that so-called sophisticated software had been used to accomplish the intrusion, and the software fingerprint indicated the software was proprietary to the federal government. The intrusion included, among other surveillance, keystroke monitoring, exfiltration of data, audio surveillance of Ms. Attkisson's conversations and activities at home while conducting Skype interviews, mining personal passwords, monitoring work and personal email, and probable compromise of Ms. Attkisson's work and personal smartphones. According to the report, the surveillance by the identified software spanned most of 2012 at least. The report also stated the intruders had accessed CBS network systems, such as the ENPS program, and that someone had also placed three (3) classified documents deep in the computer's operating system. Ms. Attkisson thereafter notified her direct supervisor at CBS News of the laptop intrusion.

45.     On February 2, 2013, an independent forensic computer analyst retained by CBS News spent approximately six (6) hours at Ms. Attkisson's home, during which time he reported finding evidence on both Ms. Attkisson's Toshiba laptop and Apple desktop computers of a coordinated, highly-skilled series of actions and attacks directed at the operation of the computers and the storage and access of data thereon. CBS engaged the company to do further analysis of the Toshiba laptop in an attempt to recover wiped data.

46.   In March 2013, Ms. Attkisson's Apple desktop computer began malfunctioning and, after several days of it freezing and emitting a burning odor, it shut down. Ms. Attkisson was unable to turn the Apple computer back on after this event.

47.   On April 3, 2013, Ms. Attkisson filed a complaint with the DOJ Inspector General.

48.   On May 6, 2013, an official with the United States Inspector General's office called Ms. Attkisson and stated that he had checked with the FBI, and the FBI denied any knowledge of any operations concerning Ms. Attkisson's computers or phone lines. The official also stated that there was no PATRIOT Act related order authorizing surveillance of Ms. Attkisson.

49.   On May 21, 2013, Ms. Attkisson publicly stated in a radio interview her belief that her computers had been compromised, but did not assign or allege responsibility. A news outlet sought a statement from the DOJ regarding Ms. Attkisson's assertions. The DOJ issued a written response stating, "To our knowledge, the Justice Department has never compromised Ms. Attkisson's computers, or otherwise sought any information from or concerning any telephone, computer or other media device she may own or use."

50.   On June 10, 2013, the independent cyber security firm hired by CBS confirmed that there was a highly sophisticated intrusion into Ms. Attkisson's computer, as well as remote actions in December, 2012, to delete all evidence of the intrusion.

51.   On June 11, 2013, CBS News issued a public statement, based on the forensics report, confirming that Ms. Attkisson's computer was accessed by an unauthorized, external, unknown party on multiple occasions in late 2012, and that the party used sophisticated methods to attempt to remove all possible indications of unauthorized activity.

52.     The DOJ Inspector General requested a copy of the CBS forensic expert's report and requested the opportunity to examine the Toshiba computer. CBS denied the requests. Ms. Attkisson then retained an independent computer forensics expert to conduct further analysis of the Toshiba computer.

53.     In September, 2013, while Ms. Attkisson continued working on the Benghazi story at her home in the evening, she observed for the first time that a third computer, her personal MacBookAir, was accessed remotely, controlled, and that data was deleted.

54.     In June of 2013, the F.B.I. had opened a case on Ms. Attkisson's computer intrusions under the auspices of a national security issue, but it failed to contact or interview her. (Ms. Attkisson was unaware of the F.B.I. case at the time it was opened and for months thereafter.)

55.     The F.B.I. case involving Ms. Attkisson's computer intrusions was circulated to the DOJ's national cyber security group and included with a set of cases opened in November, 2012, during the DOJ's expansion of its cyber team and the announcement of its intention to use "new tools" in its arsenal.

56.     In January, 2014, Ms. Attkisson agreed to release her personal Apple desktop computer to the DOJ Inspector General for analysis.

57.     On January 16, 2014, and January 27, 2014, the head of the DOJ Inspector General computer forensics unit and a colleague visited Ms. Attkisson's home as part of the investigation, which included analysis of the Apple desktop. As of this filing, they have not yet reported back on findings.

58.     Among other findings, Ms. Attkisson's computer forensics expert has identified an unauthorized communications channel opened into her Toshiba laptop directly connected to

an Internet Provider (IP) address belonging to a federal government agency, specifically the United States Postal Service, indicating unauthorized surveillance.

59.     The analysis shows the connection to a federal government agency was in use prior to January 8, 2013.  The USPS is known to have a strong relationship with the FBI, Department of Homeland Security, and DOJ when conducting computer forensic actions.

60.     Ms. Attkisson's analyst also found that while the government source who first analyzed the Toshiba laptop in January, 2013, wiped evidence, there are indications that he or she likely copied and retained the evidence on an external hard drive.

61.     Ms. Attkisson's analyst also found that direct evidence pointing to attribution for Ms. Attkisson's computer intrusions may also reside on the CBS network computer systems.

62.     The above-cited events, which offer only brief highlights of the cyber attacks suffered in Ms. Attkisson's home, caused the Plaintiffs to incur unreasonable and unnecessary expenses in an effort to diagnose and correct the problems resulting from the attacks and intrusions; resulted in an invasion of their personal and family privacy; caused them to fear for their individual and family's well-being and safety; interfered with their ability to use their telephones, computer, and television; caused Ms. Attkisson fear for her sources' well-being and safety; interfered with her ability to maintain necessary contacts with sources to perform her professional investigative reporting duties as a member of the press; affected her sources' willingness to communicate with her; distracted from her duties as an investigative reporter; and resulted in irreparable tension in her relationship with her employer.

## COUNT I--VIOLATION OF THE FIRST
## AMENDEMENT TO THE CONSTITUTION

63.     Plaintiffs incorporate and re-allege each and every allegation above as if fully set forth herein.

64.     This action arises under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

65.     The Defendants acted under color of law when conducting surveillance on the Plaintiffs and inhibiting the exercise of her First Amendment rights.

66.     The surveillance of Ms. Attkisson's computers and telephone violated the First Amendment to the United States Constitution.  By subjecting Ms. Attkisson to surveillance in relation to her investigative efforts, the Defendants sought to abridge the freedom of the press and chill the exercise of her free speech.

67.     The violation of Ms. Attkisson's First Amendment rights proximately caused her injuries, as set forth herein.

68.     The Defendants' acted with reckless and callous indifference to the federally-protected rights of the Plaintiffs.

69.     By virtue of the foregoing, the Defendants are liable to the Plaintiff Sharyl Attkisson for their violation of her rights under the First Amendment.

## COUNT II--VIOLATION OF THE FOURTH
## AMENDEMENT TO THE CONSTITUTION

70.     Plaintiffs incorporate and re-allege each and every allegation above as if fully set forth herein.

71.     This action arises under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

72.    The Defendants acted under color of law when conducting surveillance on the Plaintiffs.

73.    The surveillance of Ms. Attkisson's computers and telephone violated the Fourth Amendment to the United States Constitution. The Plaintiffs' right to be secure in their person, residence, papers, and effects against unreasonable searches and seizures was violated.  The Plaintiffs had a reasonable expectation of privacy with respect to their computers and telephones, and the Defendants had no warrant authorizing the surveillance, nor did any exigent circumstances exist at the time of such surveillance.

74.    The violation of the Plaintiffs' Fourth Amendment rights proximately caused their injuries, as set forth herein.

75.    The Defendants' acted with reckless and callous indifference to the federally-protected rights of the Plaintiffs.

76.    By virtue of the foregoing, the Defendants are liable to Plaintiffs for their violation of the Plaintiffs' rights under the Fourth Amendment.

## DAMAGES

77.    The Defendants' conduct directly and proximately caused injury to the Plaintiffs in the form of trespass upon and damage to personal property, both real and tangible, workplace harassment and intimidation, fear, stress, embarrassment, expense, inconvenience, and anxiety.

78.    In an effort to discover what was happening with Ms. Attkisson's laptop and phone lines, the Plaintiffs were forced to spend a substantial amount of time and expense in investigating the maladies and hiring others to perform forensic investigations.

79.    As a journalist, the ability to protect sources is crucial, and Ms. Attkisson's ability to offer such protection was compromised as a result of the surveillance giving rise to this claim.

This created a substantial amount of anxiety, jeopardized Ms. Attkisson's success as a journalist, and made her job more difficult than it would otherwise have been.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request judgment in their favor against Defendants, Eric H. Holder, individually,  Patrick R. Donahoe, individually, Unknown Named Agents of the Department of Justice, Unknown Named Agents of the United States Postal Service, and Unknown Named Agents of the United States, jointly and severally,

1.  for compensatory damages in an amount to be proven at trial;

2.  for punitive damages in an amount to be proven at trial;

3.  for an injunction prohibiting the Defendants, and all other agents of the DOJ and USPS, from conducting surveillance of any sort against Ms. Attkisson without first obtaining a warrant in compliance with the law;

4.  for a Declaration that Defendants' actions, practices, customs, and policies regarding the unauthorized surveillance of the Plaintiffs were unjustified, illegal, and violated the constitutional and legal rights of the Plaintiffs.

5.  for attorney's fees and costs; and

6.  for such other and further relief as the Court deems just and appropriate.

### TRIAL BY JURY IS DEMANDED

Respectfully Submitted,

Sharyl Thompson Attkisson
James Howard Attkisson,
Sarah Judith Starr Atkisson
*By Counsel*

David Thomas, Esq. (D.C. Bar No. 976513)
MICHIE HAMLETT LOWRY
   RASMUSSEN & TWEEL PLLC
500 Court Square, Suite 300
Post Office Box 298
Charlottesville, Virginia 22902-0298
(434) 951-7200; (434) 951-7218 Facsimile

C. Tab Turner, Esq.
TURNER & ASSOCIATES, P.A.
4705 Somers Avenue, Suite 100
North Little Rock, Arkansas  72116

     *Counsel for the Plaintiffs*